UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| RANDALL HEATH GREEN, | ) | Chapter 12 |
| MELODY JUNE GREEN, and | ) | |
| PRAIRIE LAND FARMS, LLC, | ) | Case No. 22-40504-crm |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

\* \* \* \* \*

## MEMORANDUM OPINION

This matter is before the Court on both the Second Motion to Convert or Dismiss, [R. 324], filed by creditor Springs Valley Bank & Trust Company, and the Amended First Motion to Modify Confirmed Chapter 12 Plan, [R. 346], filed by the Debtors.  For the reasons set forth below, Debtors' motion to modify is granted, and the creditor's motion to convert or dismiss is denied.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The farming industry is not for the faint of heart given its unpredictability and the rising costs that have plagued American farmers in recent years.  During this Chapter 12 proceeding the Debtors have faced many of the financial and environmental challenges that are currently commonplace in the American agricultural economy.

Randall Heath Green's ("Mr. Green") is a farmer of agricultural staples like soybeans, wheat, tobacco, and corn.  Mr. Green, along with his wife Melody (individually "Mrs. Green," and together with Randall, "the Greens"), have worked the farm together since 2002.  By 2019, the Greens' farming operations had expanded, leading them to establish Prairie Land Farms, LLC ("PLF," and with the Greens, "Debtors").  PLF's total geographic footprint is comprised of three separate farms (around 1,700-1,800 total acres) including the Boswell/Griffin Farms.

### Pre-Petition 2021 Crop Production

Prior to 2021, the Greens funded their farm operations through various types of agricultural loans, such as crop loans, equipment loans, and farm payments.[1]  The loans would assist the Greens in covering crop insurance, miscellaneous repairs, and expenses.  Manpower expenses arising from the Debtors' tobacco farming operations represented a particularly significant prepetition expense.  Mr. Green testified that tobacco farming requires intensive labor to plant, harvest, and dry the crop in order to sell it within a six-month turnaround.  To meet their labor needs, the Debtors took on the expense of hiring H-2A immigrant workers to assist with the production of the tobacco crop.  An additional significant, and recurring, cost for the Debtors was the acquisition of various insurance policies and coverages[2] for all of their properties.

Pre-petition, the Debtors had an established relationship with Agrifund, LLC ("Agrifund") for their crop financing each year.  In March of 2021, Debtors borrowed $1,719,031 from Agrifund, LLC ("Agrifund") to help finance that year's crop.  Agrifund took a first-priority lien on all of PLF's crops, equipment, rents, and accounts.  However, the rising costs of both tobacco crops and the H-2A Labor needed to harvest those crops required significant capital outlays which the Debtors could not fund on their own.  As a result, in April of 2021, the Greens went to Springs Valley Bank & Trust Company ("SVBT") and procured a $3,000,000 loan to PLF, secured by a mortgage on the Boswell/Griffin Farms and other farmland. As part of this loan, SVBT had the right to force place flood insurance on their collateral and seek reimbursement for the cost of this

---

[1]      Mr. Green testified that farm payments essentially allow farmers to pay down their crop loans instead of waiting to use proceeds from the sale of the crops for which the original loan was made.  Audio Recording ("AR") of August 26, 2025 hearing (on file with the Court) at [AR 10:40:46 AM].

[2]      Mr. Green testified that, prior to filing for relief, he always maintained insurance coverage for his equipment, crops, and hazard liability.  [AR at 11:58:00 AM].

coverage. SVBT has filed Proof of Claim no. 33-3, which reported a claim of $3,219,938 secured by certain parcels of the Debtors' real property.

Subsequently, in August of 2021, Mr. Green contracted COVID-19. Mr. Green was unable to help work the farm for three months due to his illness. While Mr. Green was ill, the 2021 tobacco crop was harvested by his family and H-2A Workers. However, due to Mr. Green's absence from the farm, harvesting and drying the tobacco crop took longer than usual, which prevented the Debtors from selling their tobacco crop that year.[3]

### Pre-Petition 2022 Crop Production

After the problems they experienced during the 2021 harvest, Agrifund was unwilling to finance the Debtors' operations. In order to continue farming, the Debtors turned to alternative sources of funding for their operations. Mr. Green's father, Randall A. Green ("Green Sr."), took out a loan of $120,000 from John Deere to help get Debtors' 2022 crop planted. Two of the Greens' family friends, Zachary Fehrenbacher and Kevin Baer, each issued loans to Debtors in exchange for mortgages on unencumbered property. SVBT agreed to make a smaller loan of $400,000 to PLF, also secured by a mortgage on the Boswell/Griffin Farms and other farmland. SVBT has filed Proof of Claim no. 34-3, reporting a balance of $440,498 and a security interest in certain real property.[4] PLF received an additional loan from an acquaintance, Josh Waggener, in order to cover equipment loan payments.

---

[3]    As PLF's tobacco contracts continued to decrease in value, tobacco-suitable land prices and input costs increased, and H-2A migrant labor became scarcer, the Greens made the decision to cease farming tobacco during the pendency of the bankruptcy. Mr. Green testified that tobacco location costs have increased from $2,200 to $2,800 per acre, and input costs are 43-44% higher today than in October 2022 when the petition was filed. [AR at 10:31:30 AM].

[4]    SVBT had the right in this second loan to force-place insurance on the collateral.

Although the Debtors' efforts seemed to improve their financial position in 2022, they ultimately fell behind on payments to their creditors.  Over the course of 2022, four separate creditors – Agrifund, CNH Industrial Capital America LLC ("CNH"), Huntington National Bank ("Huntington"), and Southern States – brought lawsuits against PLF for various crop loans.  On October 5, 2022, due to the foreclosure and lien recovery actions it faced, PLF sought relief under Chapter 12 of the Bankruptcy Code (case no. 22-40500).  The following day, the Greens filed their own voluntary petition for relief under Chapter 12 (case no. 22-40504).

### Post-Petition 2023 Bankruptcy

After seeking relief, the Debtors administratively consolidated their cases[5] and filed a joint Plan ("the Plan") in early January 2023.  [R. 68].  Agrifund, the Debtors' largest creditor, objected to the proposed payment, interest rate, and replacement lien treatment under the Plan.  [Rs. 101, 107].  The Debtors designed the Plan payments to quickly satisfy Agrifund's claims in order to increase payments to other creditors thereafter.  Under the confirmed plan, Agrifund's claim was assigned to Class 19 and was to be repaid at 9.25% interest.  Payments to Agrifund under the plan were to proceed as follows: first, $500,000 had been paid pre-confirmation from the 2022 crop proceeds; next, $200,000 would be paid in the summer of 2023 from winter wheat proceeds; subsequently two allotments of $330,000 were to be paid in February 2024 and again in February 2025; and, finally, the balance (including Agrifund's reasonable attorney's fees), projected by Debtors to be about $310,000, would be paid in February 2026.  This repayment schedule would free revenue from the 2026 and 2027 harvests to make larger distributions to other creditors.  [R. 113 at 9–10]; [R. 346 at 5].

---

[5]    These Chapter 12 Cases are being jointly administered under the instant case number 22-40504.  [R. 94].

As for SVBT, its larger loan was assigned to Class 10-A with an allowed claim of $3,219,921. The Plan provides Class 10-A claims with the following treatment: (i) the Debtors make an initial payment of $219,687 within thirty days of the effective date[6]; (ii) beginning October 30, 2023, Debtors were to cure any arrearage owed on SVBT's note; and (iii) the Debtors would commence making periodic payments of $112,690 semi-annually, every October and April, through April of 2041. Regarding the smaller loan assigned to Class 10-B, the plan provided SVBT with an allowed claim of $417,449 and required Debtors to make an initial payment of $17,449. Then, beginning January 1, 2024, and annually thereafter, Debtors were to pay $95,173 on the first of each calendar year until January 1, 2028. [R. 113 at 8]. After addressing the objections to the Plan,[7] this Court confirmed it on February 23, 2023. [R. 113].

### Post-Plan 2023 Crop Production and Plan Payments

Following the confirmation of the Plan in 2023, the Debtors' wheat crop became diseased. The Debtors had insured the crop and filed a claim, however the insurance company was slow to assess the claims and pay out funds for the crop. Typically, this crop would have been sold in the fall months, right before the SVBT payment became due in October of 2023. Debtors did not make a timely payment in October 2023 due to the delays in receiving the crop insurance proceeds. However, in February 2024, Debtors were able to sell some of their outstanding tobacco crop, which gave them enough funds to address some of the arrearages under the Plan. In addition,

---

[6]    The Effective Date is the first business day two weeks after the date the Court issues a confirmation order. [R. 113 at 13].

[7]    Creditors Justin Stanley and Mulzer Crushed Stone, Inc. also raised objections to the plan, relating to a modification of the stay in a state court proceeding, and an assumption of the farm lease, respectively. [Rs. 98, 102]. Per the [R. 113] Order Confirming Debtors' Joint Plan of Reorganization, the objections of Agrifund, Justin Stanley, and Mulzer Crushed Stone, Inc. were all resolved via the terms of the Order as set forth therein. [R. 113 at 1].

Debtors made another payment to the trustee on April 10, 2024 to catch up on the remaining balance attributable to the October 2023 plan payment.[8]

**Post-Plan 2024 Crop Production and Plan Payments**

In 2024, crop production was reduced because of flooding, which in turn had a domino effect on the Debtors' cash flow.  The Debtors planted their wheat crops early in the year, but they were prevented from harvesting it because of the flooding.  Additionally, the Debtors planted 2,000 acres of beans and corn, but only partially harvested these crops due to excessive rainfall.  Although their insurance carrier approved the Debtor's claims, the insurer paid the claims in allotments, causing a disruption to the scheduled payments under the Plan.  Over the course of the year, the Greens received $180,000 out of $360,000 to $400,000 in anticipated insurance proceeds.

The Debtors made payments under the Plan whenever they received insurance proceeds.  Due to the superior position of Agrifund's claim, the initial insurance payments went completely to Agrifund.  However, the Debtors were unable to make the April 2024 payment to SVBT in a timely manner.  Despite this obstacle, the Debtors continued to gather funds to remit the total amount for SVBT's April 2024 payment.  Contemporaneously, however, in response to the untimely payment, SVBT filed a motion for relief from the automatic stay.  Subsequently, SVBT and Debtors agreed to an extension of the payment deadline until July 15, 2024.  [R. 226].  When Debtors missed the July extension deadline, SVBT filed a Notice of Operation of Relief from the Automatic Stay, effectively allowing SVBT to proceed with its right to collect against its collateral.  On August 12, 2024, the Debtors were able to make a payment to SVBT, causing the bank to withdraw their notice of stay relief.

**Post-Plan 2025 Crop Production and Plan Payments**

---

[8]     At the evidentiary hearing, Mr. Green presented a check register as an exhibit and testified to the timing of the payments to cure the Plan arrearages.  [AR at 11:19:00 AM].

In April of 2025, the Ohio River flooded, pushing water up twenty feet and onto the Debtors' farm, washing out all of their crops.  Mr. Green thereafter worked diligently to repair the land after the flood and planted 130 acres of corn, 500 acres of canola in lieu of winter wheat, and milo (sorghum) on the acres that could be farmed after the flood.  Later in April of 2025, a second flood occurred near the Debtors' farm.  Mr. Green then replanted the corn crop.

The Debtors expected to receive between $300,000-$340,000 in 2025 insurance claim proceeds for all crop claims they submitted.[9]  However, as of the date of the trial, Debtors had received only $130,000 of insurance claim proceeds from the flooded corn crop, as well as the corn replant insurance proceeds of $220,000.[10]  Additionally, Debtors signed up for a United States Department of Agriculture ("USDA") initiative, the Emergency Conservation Program, to provide aid for trees impacted by ice storms early in 2025.[11]  Mr. Green testified that he hopes to receive another $95,000 from the USDA through this program.  Despite all of these challenges, the Debtors made their April 2025 payment to SVBT.

### Post-Plan 2025 Modification

Debtors now seek to modify their confirmed plan.  Their Amended First Motion to Modify[12] proposes to postpone certain payments to Agrifund and SVBT.  *See generally* [R. 346 at 18–19]; [R. 346-2 at 3].  Under the proposed modification, by August 31, 2025, Debtors will pay

---

[9]    Mr. Green testified that a range of potential insurance proceeds was given because any payout would be net of premiums charged based on geographic risks associated with the claim.  [AR at 11:32 AM].

[10]    Mr. Green testified that, in 2025, up to the time of the trial, he has only received insurance proceeds related to his corn crop and still expects to receive funds connected to his other crops.  [AR at 11:38 AM].

[11]    The USDA Emergency Conservation Program provides emergency funding to farmers to rehabilitate areas damaged by natural disasters.

[12]    Debtors filed their original [R. 235] Motion to Modify Confirmed Plan on October 7, 2024.  SVBT filed an objection to the original motion to modify on October 14, 2024.  [R. 239].  Debtors withdrew their original motion to modify and filed a subsequent [R. 346] Amended Motion to Modify on June 9, 2025.  SVBT then filed an objection to the amended motion to modify, [R. 353], which is now before the Court.

Agrifund $29,000, representing the balance due in February 2025, and Agrifund's treatment will otherwise remain unchanged.  Regarding SVBT's Class 10-A claim, the semi-annual payment due in April 2025 will be paid by August 31, 2025.  Also by August 31, 2025, Debtors will pay SVBT the amount needed to cause the principal and interest balance then owing to be reduced to match the loan's original amortization schedule.  Debtors will then resume regular semi-annual payments on the Class 10-A claim, beginning with the payment due on October 30, 2025.  SVBT's Class 10-B payment deadline will remain the same.  Additionally, under Debtors' requested modification, all allowed post-petition fees and charges in connection with either the Class 10-A or Class 10-B direct-pay claims will be paid no later than February 15, 2028.  As for payments through the trustee conduit[13], Debtors would pay the Chapter 12 Trustee $200,000 (instead of $400,000) this year, then $250,000 next year, and $600,000 from their 2026-2027 crop.  SVBT, CNH, and Huntington all filed objections to the motion to modify.[14]  [Rs. 353, 354, 355].

Unsatisfied with the timing of the payments they have received, SVBT has also filed a [R. 324] Second Motion to Convert or Dismiss this Chapter 12 case.[15]  In that motion, SVBT asserts that Debtors were 105 days late paying the Class 10-A semi-annual payment due on October 20, 2024, and were 42 days late paying the Class 10-B annual payment due on January 1, 2025.  The Chapter 12 Trustee also filed a response to SVBT's motion, concurring that the case should be dismissed because, based on the four operating reports filed in 2025, Debtors appear to

---

[13] There are two types of creditors paid through the conduit: (1) those who have secured interests in equipment and (2) unsecured creditors.

[14]     The objections filed by CNH and Huntington were resolved prior to entry of this memorandum opinion. CNH withdrew its objection after entering into an agreement with the Debtors.  Huntington obtained stay relief and subsequently sold its interest in the Debtors' collateral to Mr. Green's father.

[15]     At a July 23, 2025 preliminary hearing on Debtors' motion to modify and Huntington's emergency stay relief motion, SVBT made an oral motion to withdraw the portion of their [R. 324] Second Motion to Convert or Dismiss seeking conversion to Chapter 7.  Thus, SVBT's motion is solely a motion to dismiss this Chapter 12 proceeding.

lack the ability to make their plan payments. [R. 369].[16] In addition to SVBT's timeliness concern, they also argued that the Debtors have not paid other contractually required fees such as property insurance, real estate appraisals, unpaid interest, attorney's fees, and late fees (the "Other Fees").

### 2025 Modification Evidentiary Hearing

The Court scheduled Debtors' amended motion to modify and SVBT's second motion to dismiss for an evidentiary hearing on August 26, 2025. At the hearing, Mr. Green testified that delaying certain payments will allow PLF to survive, particularly in light of the anticipated returns. Further, he testified that, in 2025 alone, they were able to 1) pay Agrifund the remaining $29,000 owed to them this year; 2) pay SVBT their semi-annual April 2025 payment of $112,690; 3) pay the Trustee $200,000; and 4) pay an additional $100,000 in crop input costs. Notably, Debtors have nearly paid Agrifund in full. Although Debtors do not have much cash on hand, they anticipate having more money in the coming months from pending insurance claims, increased revenues from new crop varietals, and reduction in expenses attained through paying off Agrifund. The Debtors emphasized that their pivot to canola and milo crops, which are easier to plant and more lucrative per acre harvested, will help to increase revenue while saving on labor costs. Moreover, Debtors have entered futures contracts, under which PLF will deliver 13,000 bushels of beans for $140,000. Furthermore, Debtors have three separate non-bankruptcy cases pending in the state courts alleging interference with Debtors' farm operations which, once settled, may very well result in additional cash flow.

---

[16]    SVBT and the Chapter 12 Trustee also expressed serious concerns with the lapse of Debtors' property and casualty insurance in July 2025, but Debtors have since secured replacement insurance coverage to rectify that issue.

During the trial, SVBT presented evidence demonstrating that the Debtors struggled to make timely plan payments. SVBT's asset manager, Shane Buffington ("Buffington"), testified as to Exhibit 1 which detailed Debtors' payments under the plan as well as the increase in the Other Fees caused by delinquent payments. Notably, Buffington's testimony, and Exhibit 1, explained that a three-month delay was the longest SVBT has endured when waiting for a payment from the Debtors post-confirmation. Further, he testified that although the Debtors' payments were late, SVBT has received every payment they were owed under the plan.

In addition, SVBT presented testimony from Vice President and Agricultural Relations Manager Ross Key ("Key") relating to the broader economic struggles of the agricultural sector.[17] Material to SVBT's objection, Key and Buffington both testified that although the Debtors eventually made their payments, the plan modification is not feasible due to a lack of monthly operating reports. However, Key testified that there were too many assumptions required to accurately forecast the feasibility of the Modification due to market conditions in the agricultural industry. While the bank's concern at the hearing regarding timely filing of operating reports is relevant, the Court is more compelled by the Debtors' historical ability to make Plan payments.

On the other hand, SVBT's evidence regarding the Other Fees presents a separate concern to the Court. Buffington testified as to Exhibits 1 and 2 which detail the Other Fees. Buffington testified that, when Mr. Green entered into the loan agreement, it included a provision requiring hazard and flood insurance on the property securing the loan. At the time of the agreement, Debtors had hazard insurance through Kentucky Farm Bureau Mutual Insurance Company ("Farm Bureau") but did not carry flood insurance.

---

[17] Key testified that, in his opinion, the inputs for agriculture are the worst we have seen in history. Further, he verified Mr. Green's statements regarding the rising costs of raising a crop. [AR at 11:25:00 AM].

Sean Forbes ("Forbes"), Debtors' prior insurance agent at Farm Bureau, testified that flood insurance is rather difficult to obtain in the open insurance market because coverage is based on loan value rather than the value of the property itself. Further, Forbes explained that force-placing insurance on farm properties is part of the ordinary course of business for lenders in his experience. Forbes testified that the costs associated with the insurance are routinely passed on to the borrower. On the same subject, Mr. Green testified that he had communicated with a representative of SVBT about the need for force-placed flood insurance and indicated his willingness to pay the cost for obtaining such coverage. Mr. Green did not dispute that the force-placed flood insurance was a necessary expense to which SVBT was entitled under the original terms of the loan agreement.

As for the hazard insurance, the Debtors maintained a policy with Farm Bureau until June of 2025 when the insurer decided not to renew the policy. Mr. Green testified that he was without insurance for a period of forty days during which he contacted dozens of agents and visited several companies in an attempt to obtain a policy. Eventually, Mr. Green was able to find insurance for the Debtors which covered hazards and equipment, but he did not acquire flood insurance to replace the force-placed insurance obtained by SVBT.

At the trial, the Debtors' argued that they were owed rebates from SVBT for the period when the Debtors' insurance overlapped with force placed insurance. The Debtors' attorney questioned Buffington regarding whether some of the force-placed hazard insurance could be rebated. Buffington elaborated that in the original loan agreement there is a provision that, in the event the Debtors have insurance during the period where force-placed insurance is provided, then any charges will be refunded (i.e. a rebate provision). However, Buffington clarified that SVBT refunded fees for the force-placed insurance as demonstrated in Exhibits 1 and 2.

At the close of trial all the parties agreed to forgo submitting post-trial briefs in lieu of presenting their final remarks in closing arguments.

## LEGAL AUTHORITY

SVBT's second motion to dismiss relies upon 11 U.S.C. § 1208(c)(6),[18] which provides that "[o]n request of a party in interest, and after notice and a hearing, the court may dismiss a case under this chapter for cause, including—(6) material default by the debtor with respect to a term of a confirmed plan." § 1208(c)(6). "An order of dismissal under § 1208(c) is discretionary and depends upon the particular circumstances involved." *In re Wickersheim*, 107 Bankr. 177, 182 (Bankr. E.D. Wis. 1989). The party seeking dismissal bears the burden of demonstrating "cause" for dismissal of the case under § 1208(c)(6). *See In re Fennig*, 174 B.R. 475, 479 (Bankr. N.D. Ohio 1994).

Since § 1208(c)(6) does not provide clear guidance about the circumstances that constitute a "material default" of a plan's terms, much of the applicable case law relies on the particular facts and circumstances of the case. *See, e.g.*, *Fennig*, 174 B.R. 475 (debtors' failure to make any plan payments for five years post-confirmation, combined with their cessation of all farming activities and total inability to fund the plan, was sufficient to find material default); *Rice v. Dunbar* (*In re Rice*), 357 B.R. 514, 519 (B.A.P. 8th Cir. 2006) (bankruptcy court did not abuse discretion in dismissing debtor's Chapter 12 case where they failed to create a workable plan despite three chances, eight months, and help from the court); *Gahm v. United States (In re Gahm),* 2000 U.S. App. LEXIS 22736 (6th Cir. 2000) (debtor's failure to sell property as required by confirmed plan constituted  material default). A failure to make a payment required under the plan is a material default and is cause for dismissal. *Grooms v. W/C Millings, Co.* (*In re Grooms*), 64 F. App'x 922,

---

[18]    The Bankruptcy Code is set forth in 11 U.S.C. §§ 101 et seq.  Specific sections of the Code are identified herein as "section ___" or "§ ___."

923 (6th Cir. 2003) (debtors failed to make plan payments for three years believing they were exempt due to their county being declared a federal disaster area).

\* \* \* \* \*

In relevant part, § 1229(a) allows for modification of a Chapter 12 plan:

 "[a]t any time after confirmation of the plan but before the completion of payments under such plan, the plan may be modified, on request of the debtor, the trustee, or the holder of an allowed unsecured claim, to—(1) increase or reduce the amount of payments on claims of a particular class provided for by the plan; (2) extend or reduce the time for such payments; (3) alter the amount of the distribution to a creditor whose claim is provided for by the plan to the extent necessary to take account of any payment of such claim other than under the plan; or (4) provide for the payment of a claim described in section 1232(a) that arose after the date on which the petition was filed."

11 U.S.C. § 1229(a).

"In order to modify a Chapter 12 plan, a debtor must satisfy the statutory requirements of § 1229." *In re Harry & Larry Maronde Pshp.*, 256 B.R. 913, 915 (Bankr. D. Neb. 2000).  Thus, a proposed modification must comply with most of the usual plan requirements; in particular, the mandatory plan provisions set out in § 1222(a), the limits on permissible plan provisions contained in § 1222(b), the presumptions about secured creditors' acceptance or rejection of the plan in § 1223(c), and the confirmation standards detailed in § 1225(a).  11 U.S.C § 1229(b)(1); *In re Huninghake*, 655 B.R. 800, 813 (Bankr. D. Kan. 2023).  As part of satisfying the requirements for confirmation, the debtor must establish feasibility, a "probability of actual performance of provisions of the plan." *In re Crowley*, 85 B.R. 76, 78 (W.D. Wis. 1988) (citation omitted).  "More specifically, a plan will be found feasible if 'it appears reasonably probable that the farmer can pay the restructured secured debt over a reasonable period of time, at a reasonable rate of interest, in light of farm prices and farm programs as of the date of confirmation.'" *Id.*  In considering a proposed modification's feasibility, courts may consider facts and circumstances such as the

debtor's operational efficiency, historical performance, pre-petition transactions with creditors, terms of the proposed plan, and any other evidence showing the likelihood of success. *Swackhammer v. Swackhammer*, 650 B.R. 914, 921 (B.A.P. 8th Cir. 2023).

Many courts that have considered the issue, including those within the Sixth Circuit, have held that a confirmed Chapter 12 plan may be modified only where there has been an "unanticipated change in circumstances." *See, e.g.*, *In re Cook*, 148 B.R. 273 (Bankr. W.D. Mich. 1992) (where debtors' winning a $6 million lottery constituted a substantial and unanticipated change in circumstances, trustee's requested modification for 100 percent payout to creditors was warranted); *Fennig*, 174 B.R. at 479 (where debtors had ceased farming five years prior, had made no plan payments since, and had fully lost the ability to fund the plan, they could no longer modify); *Wickersheim*, 107 Bankr. at 181 ("A plan modification is only warranted where there is an unanticipated change in circumstances affecting implementation of the confirmed plan."). "Because of the difficulty in projecting income from a farming operation, requests for modification occur much more frequently than in chapter 13 cases and modification should be viewed as a routine and expected part of a chapter 12 case." 8 Colliers on Bankruptcy ¶ 1229.01[3] (16th ed. 2025).

## ANALYSIS

By all accounts, since confirmation of their plan in February 2023, Debtors have made every possible effort to keep their farming enterprise afloat. They have made the required payments under the confirmed plan. Specifically, the Debtors have made the required semi-annual payments to SVBT, albeit mostly in an untimely manner. As of April 2025, when the disastrous flood hit, Debtors were current on all payments required under the plan, though some payments had been late because insurance claims had not yet been received. The evidence presented at trial

indicates that, while the Debtors, along with the entire agricultural sector, have struggled, they have made changes to increase revenue and have significant insurance claims which will help fund the modified plan. Based upon the testimony and evidence presented, the Debtors have not materially breached the terms of the confirmed plan so as to warrant dismissal, and their proposed modification is feasible and will not violate applicable code provisions.

## I.       SVBT's Motion to Dismiss.

SVBT has failed to meet its burden of proof. The bank's witness testified that its primary concerns were threefold: (i) that Debtors' prior payments have been chronically late, (ii) that any future payments remain speculative, and (iii) that Other Fees had accrued but remained unpaid. During Mr. Green's cross-examination at the August 16, 2025 hearing, SVBT stressed that the bank had not seen any of Debtors' tax returns since 2021, and expressed concerns that the 2026 crop input rates remain in flux and unknowable.[19] In response, Mrs. Green testified that she has been doing the best she can with the resources and time available to her, given her dual role working on the farm and moonlighting as a labor and delivery nurse. Nonetheless Mrs. Green agreed that the timing and clarity of her operating report and tax return submissions needed to be improved. These additional efforts should rectify any difficulties SVBT and the Chapter 12 Trustee have had in reviewing and understanding Debtors' past and prospective finances.

Furthermore, although financial reporting is essential for interested parties during the period of a Chapter 12 plan, the history of a debtor making payments is far more instructive. In this case, the Debtors have made payments under their Plan as quickly as was possible given the circumstances. Given the repeated adverse weather events and slow claim payment by their

---

[19]     The Chapter 12 Trustee likewise addressed concerns about the lack of clarity in the monthly operating reports and the fact that Debtors' taxes for 2021-2023 appeared delinquent.

insurers, the Debtors have made consistent plan payments.  Stated a different way, the Debtors have met their obligations under the plan immediately upon receiving sufficient funds to do so.

Further, testimony from SVBT's own witnesses established that Debtors are largely not to blame for their tumultuous post-confirmation performance.  Key testified that the farming industry currently has "terrible margins," and that it is indeed a "tough time for farmers." Buffington echoed that SVBT needs updated operating reports but admitted that, on both of SVBT's 10-A and 10-B loans, the bank had received *all* payments as of the evidentiary hearing, whether timely or late, totaling about $1.1 million thus far.[20]  Taken as a whole, the testimony of these witnesses shows that the Debtors continue to make payments required under the plan, albeit in an untimely manner, despite significant financial challenges faced by the entirety of the agricultural industry in this country.

SVBT's concerns about late payments and delinquent operating reports, while valid, do not rise to the level of a "material breach[21]" of the terms of the Debtors' confirmed plan.  SVBT's concerns are predominantly rooted in the uncertainty underlying the current farming market, coupled with the Debtors' inconsistent filing of MORs and tax returns, rather than any fundamental failure by Debtors to pay their creditors or abide by the Plan.  Especially within the context of Chapter 12 cases, bankruptcy courts "must take into account the high level of unpredictability and various other exogenous factors that could have a determinative impact on a farm's success." *In re Milky Way Organic Farm, LLC*, Nos. 12-10742, 12-10777, 2017 Bankr. LEXIS 417, at *13 (Bankr. D. Vt. Feb. 14, 2017) (court found material default where debtors could not show that their failures to obtain approval of a sale, pay creditor all sale proceeds, or timely file monthly operating

---

[20]    [AR at 4:08:45 PM].

[21]    *Cf. Fennig*, 174 B.R. at 479 (where debtors had ceased farming five years prior, had made no plan payments since, and had fully lost the ability to fund the plan, they could no longer modify).

reports were due to circumstances beyond their control).  "Because farmers are regularly subject to circumstances beyond their control, it is just and appropriate for courts to give Chapter 12 debtors an opportunity to modify their plans, and pursue alternate approaches to financial reorganization, before dismissing their case based upon a default under the terms of their initial plan."  *Id.*, citing Colliers ¶ 1208.03[6].

Compared to those cases where the movant met its burden of establishing some material breach by the debtor, the situation presented here is not analogous.  *See, e.g.*, *Fennig*, 174 B.R. 475; *Gahm*, 2000 U.S. App. LEXIS 22736; *Grooms*, 64 F. App'x 922.  Our facts are more akin to *In re Welling*, 2023 WL 8108672 (Bankr. S.D.W.Va. Nov. 21, 2023).  In *Welling*, the debtor also failed to make timely payments under the confirmed Chapter 12 plan, and the bank moved to dismiss under § 1208(c)(6), alleging material default.  However, the bankruptcy court held that the farmer, though behind on payments, had not committed a material default: "Significantly, there is no evidence of bad faith on the Debtor's part, and the Debtor appears to have been diligently working, in good faith, to cure the payment default under the Plan.  Debtor made a partial cure payment in July and has proposed a sale of the Family Farm that, when combined with the prior payment, will pay Farm Credit's Real Estate Claim in full."  *Id.* at *5.

The Greens too have faced countless obstacles, from illness to natural disaster, in their last few years in the farming industry, but nonetheless have continued to make good faith efforts to abide by the Plan and cure any defaults as they arise.  While Plan payments to SVBT were late, they were made once the Greens had the cash to do so.[22]

---

[22]    Mr. Green testified that Exhibit A detailed the payments he made to the Chapter 12 Trustee in February of 2024, explaining that these sums were from an insurance claim related to his winter wheat crop from 2023.  Further, Mr. Green testified that he "operates off of what comes in when it comes in" and sometimes he is forced to make late payments.

SVBT has received over a million dollars from Debtors so far and will continue to be paid on their loans under the proposed modification. Further, according to Debtors' testimony, by this time next year, Debtors will have: (1) paid off their primary lender, Agrifund, in full, (2) will have cured all arrearages and resumed semi-annual regular payments to SVBT, (3) will have received some portion of the $360,000 in anticipated insurance payouts, (4) will have begun their futures contracts for $140,000 worth of beans. The debtors also indicated that they may have additional funds from favorable results from their non-bankruptcy litigation.

Moreover, SVBT did not cite to, nor could the Court independently identify, any precedent that would support dismissal of a post-confirmation Chapter 12 proceeding with a factual scenario similar to the one existent in this case. In other words, based on the evidence adduced at trial, the Debtors have incurred certain late fees, interest fees, and attorney's fees due to delinquent payments, but have nonetheless reduced the amount they owe to SVBT. The Debtors' pattern of payment has been consistent, and they took action to address their lack of insurance in a reasonably expedient manner. SVBT proved these facts at trial but did not cite any precedent that would support dismissal based on a similar factual record.

In light of the relatively flexible standard courts have employed in relation to Chapter 12 farmers who encounter such unforeseen challenges, *see, e.g.*, *Welling*, 2023 WL 8108672, *Swackhammer*, 650 B.R. 914, dismissal of this case at this juncture is not appropriate.

## II.    Debtors' Motion to Modify Plan.

Courts in the Sixth Circuit have required that the debtor show a "substantial change" post-confirmation to justify modification of a Chapter 12 plan. *Cook*, 148 B.R. 273; *Fennig*, 174 B.R. 475. "At a minimum, the party requesting modification ought to be able to show some change in circumstances from the date of the original confirmation hearing." *In re Hudson*, 2014 Bankr.

LEXIS 820, at *8 (Bankr. M.D. Fla. Feb. 28, 2014), citing Collier on Bankruptcy, ¶ 1229.01[3] (2013).  "Most commonly, modification is sought by a debtor when there has been an unanticipated substantial decrease in income or downturn in circumstances."  *Id.* (citing *Cook* at 278-80).

In considering the requested modification amidst Debtors' circumstances, this Court finds cases like *Swackhammer*, 650 B.R. 914 (B.A.P. 8th Cir. 2023), to be instructive.  In *Swackhammer*, the farmer-debtors alleged their circumstances had changed substantially for the worse due to abnormally wet weather, equipment failure, employee illness, and losses due to delayed financing. On the debtors' contested fourth motion for modification, the court held that debtor's testimony proved he was unable to meet his crop yield projections due to the ongoing delay in financing, leading to a loss in acreage which, "whether unanticipated or not," constituted a substantial change in circumstances.  *Id.* at 941; *see also In re Craven*, 97 B.R. 549 (Bankr. W.D. Mo. 1989) (court approved Chapter 12 plan modification extending loan terms for another year, reasoning that debtor had been unable to make plan payments due to a severe drought).  Here, though Debtors have not suffered any loss in farmable acreage, years of dramatic weather, delayed insurance payouts, and below-average crop yields have clearly impeded their ability to perform under the Plan.  These factors together constitute a significant change in circumstances.

In addition to showing a substantial change in circumstances, the Debtors must satisfy all confirmation requirements under § 1229.  Section 1229(b) requires that any modification must comply with §§ 1222(a), 1222(b), 1223(c) and 1225(a).  11 U.S.C. § 1229(b).  In this case, parties in interest have raised both feasibility and the treatment of secured claims as impediments for the Debtors' proposed modification. The Court will address these two requirements for modification below.

### a.  Feasibility of the Modification

The Chapter 12 Trustee expressed concern at the evidentiary hearing regarding the feasibility of the proposed modification, specifically calling into question the ability of the Debtors to raise crops, given their current cash flow. The Chapter 12 trustee's concerns aptly point to the confirmation requirement in § 1225(a)(6), the feasibility test.

In support of feasibility, Debtors must put forth evidence of income or plans to generate income. *Swackhammer v. Swackhammer*, 650 B.R. 914 (B.A.P. 8th Cir. 2023). "Efforts to satisfy the feasibility requirement in [the] context of a post-confirmation modification must be accompanied by accurate financial data sufficient to overcome the prejudicial effect of the preceding year's budget experience." *In re Larson*, 122 B.R. 417, 421 (Bankr. D. Idaho 1991) *quoting In re Hagen*, 95 B.R. 708, 712 (Bankr. N.D. 1989). In *Hagen*, the debtors' Ch. 12 plan underestimated potential expenses by 38%. *Id*. The court concluded that a subsequent modification could not be approved where the debtor was incapable of supporting their testimony that they could sell their crop at the estimated price. *Id*.

In the case at hand, the proposed modification satisfies the feasibility test. As Mr. Green testified, under the proposed modification, semi-annual Class 10-A payments to SVBT will merely shift forward in time, while the annual Class 10-B payment will remain the same. Although SVBT and the Trustee question whether the Greens can generate income to meet their obligations, they have done so thus far, and the modification merely shifts the timing of payments, rather than forgoing, reducing, or suspending them. Moreover, the Debtors have shifted to crops that are somewhat less costly to plant while also demanding a higher price. The Debtors project that SVBT will be paid every penny to which it is entitled. Moreover, as Debtors explain, "after next year, Agrifund, to whom the Debtors have paid more than $300,000 per year from the 2022, 2023, and 2024 crops, will be paid off, such that there will be no claim against the Debtors' earnings for the

2026 and 2027 crop years and the Debtors will have the capacity to make the higher, back-loaded payments to the Standing Trustee and [SVBT]."  [R. 346 at 24]. Accordingly, the modifications proposed would meet the test for feasibility as well as all other confirmation requirements under other applicable portions of Chapter 12.

The Greens have struggled to make timely payments due to delays in receiving insurance payouts for floods, but they are beginning to gradually receive these insurance proceeds.  In reviewing their monthly operating reports from 2023 through 2025, Debtors have demonstrated an ability to improve their position since filing, having increased their net income on average by 180% in that time.[23]  Mr. Green attributed these upward trends to varied crop selection, namely his shift away from tobacco and corn towards sorghum and canola to increase margins.  Mr. Green has demonstrated an earnest willingness to adapt in times of economic uncertainty, testifying, "I do everything I can do to get the money as fast as I can to keep people paid."  [AR at 11:34:21 AM]. Meanwhile, SVBT's President underscored the many assumptions and unknowns that go into projecting a farm's feasibility, admitting that many of his agriculture clients are struggling. Although these broader agricultural economic issues impact the Debtors, they do not establish grounds to deny the modification.

Based on Debtors' changes in operations, high insurance premiums, and the apparent economic uncertainties plaguing the agriculture industry, the totality of the circumstances support a finding of feasibility for modification under § 1225(a)(6).  *Cf. Huninghake*, 655 B.R. 800 (§ 1229(b) requirement not met where debtors admitted they were unable to pay market rates). As explained during closing arguments, Debtors are only about $250,000 short of meeting all

---

[23] The Court calculated the year-over-year change of net income for each month the Debtors filed operating reports $(x_1 - x_2)/x_1$. Then using each year over year change took an average of the monthly percentage change to reach an average increase in net income of 180%.

obligations and their property has not deteriorated. SVBT is in a better position post-confirmation than when the bankruptcy began. If the case is dismissed now, the Greens' farming operations will likely cease. The considerable effort of the Greens, combined with the surrounding economic circumstances, leaves the Court unpersuaded that the proposed modification is not feasible.

### b. Modifying Secured Claims

Having determined that the proposed modification is feasible, the only remaining issue is the treatment of SVBT's claims in the modification. At trial, and in their motion to dismiss, SVBT argued that, in addition to principal and interest, they are entitled to payment of the Other Fees which accrued due to the Debtors' delinquent plan payments. The Debtors' modification provides for payment of SVBT's loan and interest rate for both Class 10 claims, but the language is silent as to the Other Fees. However, under the plan, the treatment of Class 10-B provides that "all other terms of the contract shall remain in full force and effect." [R. 346 at 12]. The modification also includes a catch-all provision below the treatment of class 10-B, that states "[f]or avoidance of doubt, *any post*-petition fees and charges that the Court allows shall be paid on or before February 15, 2028." [R. 346 at 19] (emphasis added). Nonetheless, in their response to the SVBT's motion to dismiss, the Debtors state "[e]ven if the Bank were entitled to recover its legal fees as an oversecured creditor—and the Debtors have never conceded that the Bank is oversecured, only that its petition-date claims were fully secured—those fees are recoverable only if they are reasonable, and the Bank has offered nothing whatsoever in support of the amounts its lawyer has charged." [R. 338 at 5]. The Court infers from this statement that the Debtors are asserting that SVBT cannot have post-confirmation fees, costs, and charges because it is not an oversecured creditor under § 506(b).

The language of § 1222(b) provides that the plan may modify the rights of holders of secured claims . . . or leave unaffected the rights of holders of any class of claims.  11 U.S.C. § 1222(b)(2).  This broad power of Chapter 12 debtors to alter the rights of secured creditors is limited only by § 1225(a)(5) which requires that the secured creditor retain its lien and receive distributions that equal the allowed amount of its claim.  As such, as long as the plan does not violate § 1225(a)(5), it could conceivably alter all of the secured creditors contractual rights in the underlying note.  However, where the plan does not expressly modify certain rights of the secured creditor then those rights remain valid after confirmation.  Finally, upon confirmation

> …the provisions of a confirmed plan bind the debtor, each creditor, each equity security holder, and each general partner in the debtor, whether or not the claim of such creditor, such equity security holder, or such general partner in the debtor is provided for by the plan, and whether or not such creditor, such equity security holder, or such general partner in the debtor has objected to, has accepted, or has rejected the plan.

11 U.S.C § 1227(a); *see also In re Lyon*, 161 B.R. 1013, 1018 (Bankr. D. Kan. 1993) (explaining § 1227(a) requires that, after confirmation, the plan provisions bind the parties and the limits of what may be modified are defined in § 1225(a)(5)).  After confirmation of the plan, the terms of the plan, not § 506, control the legal relationship between the Debtors and their creditors. *See Telfair v. First Union Mortg. Corp.*, 216 F.3d 1333, 1338-39 (11th Cir. 2000) (holding that the requirements of § 506(b) do not apply to the post-confirmation period).

Here, the Debtors propose to modify the 10-A and 10-B claims such that they cure past due plan payments and change payment due dates, but they do not explicitly seek to modify SVBT's allowed secured claim.  The confirmed plan explicitly provides for amounts necessary to cure arrearages and retains all other terms of the contract.  A review of the note and mortgage reveals that the Other Fees were part of the pre-petition contractual agreement between the Debtors and SVBT.  Moreover, Mr. Green and Mr. Forbes both testified that the Debtors intended to rely on

the original mortgage terms for its force-placed flood insurance.  Furthermore, at trial the Debtors contested the amount of the Other Fees they owed, but did not contest the validity of the fees themselves.  As such, it seems as if the Debtors conceived of hewing to the terms of the note and mortgage that were unaddressed in the plan or modification.  Nothing in the language of the plan or the modification expressly modifies SVBT's rights to claim the Other Fees post-confirmation.  Absent such an express modification, the bank retained the right to the Other Fees when appropriate pursuant to the promissory note.

As such, the Court will allow the Other Fees under the catch-all provision of the modification.  In order to determine the amount of allowed fees under this provision, SVBT must file a statement of these fees, with supporting documentation, within ninety (90) days of the date of this Order.  The Debtors will then have fourteen (14) days thereafter to review this statement and object to the fees. Having considered the matter fully, and being otherwise sufficiently advised,

IT IS HEREIN ORDERED that Debtors' [R. 346] Amended First Motion to Modify Confirmed Chapter 12 Plan is GRANTED, and Springs Valley Bank & Trust Company's [R. 324] Second Motion to Convert or Dismiss is DENIED.

Charles R. Merrill
United States Bankruptcy Judge
Dated: December 12, 2025

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

In re:                                          )
                                                )
RANDALL HEATH GREEN,                            )          Chapter 12
MELODY JUNE GREEN, and                          )
PRAIRIE LAND FARMS, LLC,                        )          Case No. 22-40504-crm
                                                )
                        Debtors.                )          (Jointly Administered)
                                                )
_____)

\* \* \* \* \*

## ORDER

     This matter is before the Court on both the Second Motion to Convert or Dismiss, [R. 324], filed by creditor Springs Valley Bank & Trust Company, and the Amended First Motion to Modify Confirmed Chapter 12 Plan, [R. 346], filed by the Debtors.  For the reasons set forth in the memorandum opinion filed contemporaneously herewith, and having considered the matter fully, and being otherwise sufficiently advised,

     IT IS HEREIN ORDERED that Debtors' [R. 346] Amended First Motion to Modify Confirmed Chapter 12 Plan is GRANTED, and Springs Valley Bank & Trust Company's [R. 324] Second Motion to Convert or Dismiss is DENIED.

Charles R. Merrill
United States Bankruptcy Judge

Dated: December 12, 2025